UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


UNITED STATES OF AMERICA                        CRIMINAL ACTION

VERSUS                                          NO:  05-0266

MARIA CARMEN PALAZZO, M.D.,                     SECTION: "S"
PH.D., MMM


<u>ORDER AND REASONS</u>

     **IT IS HEREBY ORDERED** that Maria Carmen Palazzo's motion to suppress is

**DENIED**.  (Document #38.)

     **IT IS FURTHER ORDERED** that Palazzo's motion to dismiss counts 41-55 of the

superseding indictment (counts 3-17  of the original indictment) is **GRANTED**.  (Document

#31.)

     **IT IS FURTHER ORDERED** that Palazzo's motion to sever counts 41-55 of the

superseding indictment (counts 3-17 of the original indictment) is **DENIED AS MOOT**.

(Document #34.)

     **IT IS FURTHER ORDERED** that Palazzo's motion to dismiss counts 1-27 of the

superseding indictment (count 1 of the original indictment) for failure to state an offense and,

alternatively, for a bill of particulars is **DENIED**.  (Document #80.)

**IT IS FURTHER ORDERED** that Palazzo's motions to dismiss counts 28-40 of the superseding indictment (count 2 of the original indictment) is **DENIED**.  (Document #29.)

**IT IS FURTHER ORDERED** that the motion to strike surplusage is **DENIED.** (Document #33.)

**IT IS FURTHER ORDERED** that, because of the filing of the superseding indictment, the motion to dismiss counts one and two of the original indictment as duplicitous is **DENIED AS MOOT**.  (Document #30.)

## I. BACKGROUND

Maria Carmen Palazzo, M.D., Ph.D., MMM[1] (Dr. Palazzo), a licensed medical doctor specializing in psychiatry, was a Medicare provider authorized to submit bills for reimbursement for certain medical services to eligible Medicare beneficiaries.  Medicare is funded with Social Security taxes and is administered by the United States Department of Health and Human Services (HHS) through the Centers for Medicare and Medicaid Services (CMS), an agency of HHS.

Mutual of Omaha received, settled, and paid Medicare Part A claims for Touro Infirmary, pursuant to a contract with CMS.  Arkansas Blue Cross and Blue Shield paid Medicare Part B claims submitted by Medicare beneficiaries or Louisiana health care providers, pursuant to a contract with CMS.  Dr. Palazzo submitted Medicare Part B bills to Blue Cross/Blue Shield using a HCFA/CMS form 1500, the standard claim form in the health insurance industry.

---

[1]   In addition to her medical degree, Dr. Palazzo holds a Ph.D in philosophy and a Master's Degree in Medical Management.

On July 5, 2000 and July 27, 2001, Dr. Palazzo entered into a professional services agreement with Touro, under which Dr. Palazzo would provide consultation services for the Adult Psychiatric Programs at Touro.  On June 1, 2002 and June 1, 2003, Dr. Palazzo and Touro entered an agreement for Dr. Palazzo to provide medical director services for the Inpatient Adult Psychiatric and Adult Partial Hospitalization Programs (PHPs) at Touro.[2]  Each agreement was for a one-year term and provided compensation at a rate of $150 per hour up to $144,000 per year.  Dr. Palazzo was required to provide a written monthly statement documenting the amount of time spent and detailing services she rendered.

On October 31, 2000, SmithKline Beecham, Corporation (SKB) hired Dr. Palazzo as a clinical investigator to carry out clinical studies to evaluate the efficacy and safety of Paxil in children and adolescents with obsessive-compulsive disorder.  Dr. Palazzo agreed, *inter alia*, to personally review all case report forms regarding each study subject and received $5,410 for each subject who completed the study.  On February 9, 2001, SKB entered into a contract with Dr. Palazzo to participate as a clinical investigator to assess the long term safety of Paxil in children and adolescents with major depressive disorder or obsessive-compulsive disorder.  Dr. Palazzo agreed to comply strictly with the study protocol and to review personally all information regarding the study subject.  SKB agreed to pay Dr. Palazzo $5,020 for each study subject who completed the study.  When Dr. Palazzo did not comply with the criteria to provide

---

[2]   PHPs  provide intensive psychiatric care and closely resemble that of a highly structured, short term, inpatient hospital program.  Continued treatment requires evidence that less intensive treatment options could not provide the level of support necessary to maintain the patient and to avoid hospitalization.

satisfactory research records, her contract to participate in the drug studies was terminated..

On August 25, 2005, the grand jury charged Dr. Palazzo with two counts of health care fraud and 15 counts of failure to maintain records of the clinical drug studies in violation of 21 U.S.C. § 355(i).  On January 14, 2007, the grand jury returned a superseding indictment charging Dr. Palazzo with 40 counts of health care fraud and 15 counts of violations of § 355(i).

The allegations of health care fraud in the superseding indictment are as follows.  From a date unknown until December 31, 2003, Dr. Palazzo fraudulently obtained money from Medicare by billing for comprehensive subsequent hospital visits to patients once a week, when in fact she did not conduct individual face-to-face visits requiring complex medical decision making.  Dr. Palazzo instead summoned PHP employees to her 7th floor office to create patient notes to facilitate a Medicare billing after all of the PHP patients left the facility for the day.

Further, from August 2000 until May 2002, Dr. Palazzo used a physician's assistant to create false documents supporting the appearance of daily medical visits to PHP patients to receive money to which she was not entitled.  Dr. Palazzo routinely signed false CMS Form 1500's that did not identify that the physician's assistant was the provider of the service for which she was billing Medicare and Medicaid, but falsely represented that she had personally performed the services.  Dr. Palazzo received approximately $477,901 from Medicare and $175,651 from Medicaid.

The superseding indictment further alleges that, as part of the scheme to defraud, Dr. Palazzo did not allot adequate time for physician assistant visits; instructed the physician assistant to be creative in composing patient notes without providing beneficial services; greeted

patients personally for the sole purpose of billing; submitted bills for face-to-face visits when group therapy was provided; falsely identified herself as the provider of services in order to receive 100% of the fee schedule reimbursement; submitted bills for face-to-face services when she participated in non-reimbursable team medical conferences; placed patients in group homes over which she had ownership or control; required "Touro at Home," Touro's home health agency, to hire two nurses who had provided services to the defendant's patients for years; kept long-term patients enrolled in the PHP for periods far exceeding what was medically necessary without significant changes in the plans of care; and discharged almost all of her patients from the Touro PHP when she was no longer medical director, when she had previously certified their ongoing need for PHP care for years.

On November 4, 2004, the government executed search warrants and seized evidence at Dr. Palazzo's home and office.  Dr. Palazzo filed a motion to suppress the seized evidence. Moreover, Dr. Palazzo filed a motion to suppress count two of the indictment, a motion to dismiss counts one and two as duplicitous, a motion to dismiss counts three through seventeen of the original indictment,  a motion to dismiss counts one through twenty-seven, a motion to strike surplusage, and a motion to sever.  The government filed a motion *in limine*.

## II. DISCUSSION

### A.  Motion to suppress seized evidence

Dr. Palazzo contends that the search warrants executed at her home at 5718 St. Charles Avenue and at her office on the 7th floor of 3450 Chestnut Street on November 4, 2004, are invalid, and the evidence seized pursuant to the warrants must be suppressed.  Specifically, Dr.

Palazzo argues that the affidavits in support of two warrants failed to establish probable cause to seize records of Creative Investment (a real estate venture), GGS Psychiatric Clinic of New Orleans, LLC (the doctor's drug research company), Palazcoe, LLC (the doctor's real estate investment company), or Decisioncare, Inc. (psychiatric utilization review consultants); the affidavits contain unsupported, conclusory allegations by the affiant; the allegations are attributed to employees and former employees without any indicia of reliability; the government did not review the Form 1500s in preparing the affidavits accusing Dr. Palazzo of submitting fraudulent bills; the government did not inform the magistrate judge that some of the services billed to Medicare and Medicaid may have been performed by Dr. Palazzo's staff of physician's assistants, psychologists, and social workers and billed under Dr. Palazzo's name and provider number as "incident to" services; the affidavits failed to establish probable cause that the drug study records would be found in either of the locations to be searched because the Food and Drug Administration's (FDA) inspection of the records concluded on August 28, 2001; and the affidavits are deficient because they are overly broad ("travel records, credit card records, property records, gambling records, ownership and upkeep of a race horse").  Dr. Palazzo argues that, as a result, the magistrate judge was misled into thinking that Dr. Palazzo submitted fraudulent bills, claiming to have worked more than 24 hours on certain days, and that the informants' statements were credible.

The government argues that specificity in a warrant is not necessary, and a description is sufficiently particular when it enables a searcher to reasonably ascertain and identify the items to be seized.  The government argues that the affidavit clearly established that the health care fraud

was contingent on the amount of hours spent providing treatment in a day.  Any activity

associated with Dr. Palazzo's professional whereabouts, social activities, and other business

ventures would disable her from the ability to practice medicine to the extent of which she billed

Medicare and Medicaid.  The government argues that it is of no consequence that the names of

the entities in question were not mentioned in the affidavit because the investigators had the

authority to seize any items that could be reasonably used to determine Palazzo's whereabouts

during the 24 hour periods for which she was billing for services she allegedly provided.

"A valid search warrant may be issued only upon a finding of probable cause."  United

States v. Perez, 484 F.3d 735, 740 (5th Cir. 2007).  "The information necessary to show probable

cause must be contained within a written affidavit given under oath."  Id.  "Probable cause does

not require proof beyond a reasonable doubt; a magistrate need only have a substantial basis for

including that a search would uncover evidence of wrongdoing."  Id.  "A magistrate's

determination is entitled to deference by reviewing courts."  Id.  "[I]tems of an 'incriminatory

character' which are found in the course of a legal search, yet which were not described in the

search warrant, may be seized."  United States v. Loe, 248 F.3d 449, 460 (5th Cir. 2001).

"Absent evidence of an intentional material misrepresentation or omission in the affidavit, the

warrant will not be invalidated."  United States v. McCarty, 36 F.3d 1349, 1356 (5th Cir. 1994).

A search warrant was obtained for documents and records "relating to Medicare Parts A

and B, Louisiana Medicaid billings, and Food and Drug Administration (FDA) records for

patient care purportedly provided by Dr. Maria Carmen Palazzo" supported by the affidavit of

Juliana Etland, a Special Agent with the HHS, Office of Inspector General.  Rec. doc. 63, exh.

15.  The affidavit was based on "direct personal knowledge derived from investigation and information provided by person[s] believed to be credible and to possess accurate information regarding Dr. Palazzo."  The persons referred to in the affidavit were past employees, current associates of Dr. Palazzo, and FDA investigators.  The affidavit is specific as to the findings of the investigators, who reviewed records and conducted interviews at the various locations where Dr. Palazzo practiced, concerning violations of the Medicare program, the Medicaid program, and FDA regulations.  The gravamen of the accusations was that Dr. Palazzo billed for more hours of service than were actually rendered.  A compilation of 112 days of billing records was made in order to illustrate the excessive number of hours per day for which Dr. Palazzo billed federal and state insurance programs.  The affidavit is specific as to the location of documents and records, such as filing cabinets containing patient records, patient sign-in sheets and notes, appointment books, financial records, billing records, and stored business records.

Further, the government sought to seize Dr. Palazzo's computer data and hardware to gather physical evidence of Medicare, Medicaid, and FDA fraud based on a belief that the computer system was used in the practice and that it contained evidence of fraud. The extent of the items seized was based on consultation with an FBI special agent, who had expertise in retrieving and analyzing electronically stored data.

The court finds that the affidavit sufficiently referred to specific items to be seized and set out the reasons for the search of the particular items.  See United States v. Shugart, 117 F.3d 838, 845 (5th Cir 1997) ("The incorporation of the detailed statement satisfied the particularity requirement.).  The affidavit establishes, by a fair probability, that the search would produce

health care records, drug study records, and evidence of how much time Dr. Palazzo spent in

non-patient activity.  Palazzo points to no material misrepresentation that would invalidate the

warrant.

Therefore, the warrant for the search was supported by probable cause, and the motion to

suppress the seized evidence is denied.[3]

**B.  Motion to dismiss counts 41-55 of the superseding indictment**

Palazzo moves to dismiss counts 41-55 of the superseding indictment (counts 3-17  of the

original indictment).  In counts 41-55, the grand jury charges that Palazzo failed to prepare and

maintain records required under 21 U.S.C. § 355(i)[4] and 21 C.F.R. § 312.62(b),[5] *i.e.* adequate

---

[3]    Because the court denies the motion to suppress the seized evidence, an evidentiary
hearing pursuant to Franks v. Delaware is not necessary.

[4]    21 U.S.C. § 355(i) provides in relevant part:

(i) Exemptions of drugs for research; discretionary and mandatory conditions;
direct reports to Secretary

(1)  The Secretary shall promulgate regulations for exempting from the operation
of the foregoing subsections of this section drugs intended solely for
investigational use by experts qualified by scientific training and experience to
investigate the safety and effectiveness of drugs.  Such regulations may, within
the discretion of the Secretary, among other conditions relating to the protection
of the public health, provide for conditioning such exemption upon–
. . . .
(C)  the establishment and maintenance of such **records**, and the making of such
reports to the Secretary, **by the manufacturer or the sponsor of the
investigation of such drug**, of data (including but not limited to analytical
reports by investigators) obtained as the result of such investigational use of such
drug, as the Secretary finds will enable him to evaluate the safety and
effectiveness of such drug in the event of the filing of an application pursuant to
subsection (b) of this section.

and accurate case histories on each individual administered the investigational drug, Paxil, or employed as a control in the investigation.  Palazzo contends that §355(i) allows the Secretary of the HHS to impose record-keeping requirements on the manufacturer or the sponsor of the investigation, but does not authorize the imposition of criminal liability upon the clinical investigator for failing to maintain accurate records.  She argues that, although she was subject to FDA regulations, she was not exposed to criminal liability related to maintaining records for the study.

"The Constitution provides that '[a]ll legislative Powers herein granted shall be vested in a Congress of the United States.'"  <u>Touby v. United States</u>, 111 S.Ct. 1752, 1755 (1991) (quoting U.S. Const., Art. I, § 1.).  "From this language the Court has derived the nondelegation doctrine: that Congress may not constitutionally delegate its legislative power to another branch of Government."  <u>Id</u>.  "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government."  <u>Id</u>. at 1755-56.  "Congress does not violate

---

Section 331(e) imposes criminal penalties for failure to establish or maintain records as required under § 355(i).

[5]   Section 312.62(b) provides:
**Investigator recordkeeping and record retention.**
(b) Case histories.  An investigator is required to prepare and maintain adequate and accurate case histories that record all observations and other data pertinent to the investigation on each individual administered the investigational drug or employed as a control in the investigation.  Case histories include the case report forms and supporting data including for example, signed and dated consent forms and medical records including, for example, progress notes of the physician, the individual's hospital chart(s), and nurses' notes.  The case history for each individual shall document that informed consent was obtained prior to participation in the study.

the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." Id. at 1756. "So long as Congress lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power." Id. (internal quotation and citation omitted).

In Touby, the Supreme Court did not resolve the issue as to whether more specific guidance is required "when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions . . .[that] pose a heightened risk to individual liberty." Id. However, Touby is instructive because it demonstrates conditions under which the delegation of power satisfies constitutional concerns. Touby examined an expedited procedure by which the Attorney General can schedule a substance in schedule I on a temporary basis under 21 U.S.C. § 811(h), when doing so is necessary to avoid an imminent hazard to the public safety. Id. at 1756. The Attorney General determined that temporary scheduling was necessary to enable the government to respond to the threat posed by dangerous, new "designer drugs." Id. The Supreme Court held that Congress' authorization to promulgate regulations "passes muster" in this case because the Attorney General's discretion to define criminal conduct was meaningfully constrained inasmuch as the statute includes six factors that the Attorney General must consider and a 30-day notice requirement. Id. Moreover, 21 U.S.C. 812(b) identifies mandatory requirements that must be satisfied. Id. at 1757. The Supreme Court stated that the multiple, specific restrictions on the Attorney General's discretion to define criminal conduct "satisfy the constitutional requirements of the nondelegation doctrine." Id.

11

The Court of Appeals for the Ninth Circuit and the Eighth Circuit have addressed the nondelegation doctrine as it applies to § 355(i) and reached different conclusions.  In <u>United States v. Smith</u>, 740 F.2d 734 (9th Cir. 1984), the Court of Appeals considered whether § 355(i) in conjunction with 21 C.F.R. 312.1 "make it a crime for a clinical investigator to maintain inadequate or inaccurate records."  The district court had dismissed the counts under § 355(i) because the statute and regulations did not attach criminal liability to clinical investigators, and the Court of Appeals affirmed the decision.  <u>Id</u>. at 736-37.  The Court of Appeals reasoned as follows:

> Although the statute expressly authorizes regulations which impose affirmative duties on manufacturers and the sponsors of clinical investigations, we are reluctant to read the statute as authorizing criminal penalties for the violation of any regulation promulgated pursuant to the statute's *general* authorizing language.  In creating the obligation to maintain drug testing records, Congress expressly imposed the burden on manufacturers and sponsors.  § 355(i)(3).  The government asks that we extend the statutory obligation to include clinical investigators pursuant to the statute's general regulatory authority which allows the Secretary to establish "other conditions relating to the protection of public health" before exempting manufacturers from the statute's basic drug approval application requirements.  § 355(i).  Such general authorizing language, however, is <u>insufficient legislative guidance for the issuance of regulations which, if violated, would furnish the basis for criminal liability</u>.  Executive agencies have the authority to establish regulations which are enforced by criminal penalties only when Congress has provided "sufficient guidelines and standards for the exercise of the authority."  <u>United States v. Davis</u>, 564 F.2d 840, 844 (9th Cir. 1977). (Emphasis supplied.)
>
> Moreover, even if Congress had provided standards for extending the record keeping requirement to investigators by regulation, the regulatory language falls short of imposing an explicit affirmative duty on the investigators to maintain accurate records. . . . Absent such a clear articulation of duty, we are not prepared to fasten criminal liability to the investigator who fails to fulfill his or her obligation to the sponsor.

. . . .

The statute and regulations at issue here do not impose a clear duty on investigators to maintain accurate records.  They only impose affirmative duties on drug manufacturers and the sponsors of clinical investigations.  If the FDA discovers that an investigator has falsified information in forms submitted to the sponsor, the FDA, pursuant to the regulations, may conduct an administrative hearing and revoke the investigator's entitlement to work with investigational drugs.  21 C.F.R. § 312.1(c).[6]

The United States Court of Appeals for the Eighth Circuit disagreed with Smith in United States v. Garfinkel, 29 F.3d 451 (8th Cir. 1994).  Even though the regulations in Smith had been amended since Smith was decided, the district court adopted Smith and dismissed counts charged against a clinical investigator under § 355(i) because the statute does not contain language authorizing the FDA to promulgate regulations covering protocol investigators.  Id. at 453.  The Court of Appeals reversed and remanded, holding that § 355(i) "authorizes the investigator record keeping regulations at issue here and this delegation of authority to FDA satisfies the constitutional concerns of the nondelegation doctrine."  Id. at 459.  Applying Touby, the Court of Appeals examined the language of § 355(i), the purpose of the Act, and the statutory context of the standards and concluded that § 355(i) imposes significant guidelines upon the FDA which "more than satisfy the requirement that Congress lay down an intelligible principle to restrain the agency's authority."  Id. at 458.

The Court of Appeals also held that "the language of the statute is ambiguous at least as

---

[6]  Section 312.1(c) was in force when Smith was decided.  The regulation was amended in 1987 to address recordkeeping by investigators.  See § 312.62.

13

it relates to FDA's authority over clinical investigators,"[7] and examined the "legislative history to determine whether FDA's interpretation conflicts with Congress' expressed intent."   Id at 456.  The Court of Appeals agreed  that "Congress' focus was on the manufacturers and sponsors of investigational drugs" but found "nothing in the legislative history to indicate that Congress intended to limit FDA's authority to the sponsors and manufacturers."  Id.

The court agrees with the reasoning of the Ninth Circuit in Smith that § 355(i) does not authorize criminal penalties for violations by clinical investigators in maintaining adequate and accurate records.  Congress did not grant broad authority, but specifically singled out manufacturers and sponsors, not clinical investigators.  Unlike the decision in Garfinkel, the court concludes that nothing in the language of § 355(i) provides sufficient guidelines regarding clinical investigators to serve as an intelligible principle to which the HHS or the FDA is directed to conform.  The statute falls short of the multiple restrictions or mandatory requirements of Touby with regard to any party other than the manufacturer or the sponsor of the investigation.  Although the amended, post-Smith regulations impose responsibility on clinical investigators to maintain adequate and accurate records, the focus of the constitutional inquiry is not directed to the amended regulations, but to the language of § 355(i) and whether the statute is specific as to the restraints on imposing criminal conduct.  Accordingly, the court concludes that

---

[7]    Although Garfinkel states that the statute is ambiguous as to the delegation of authority, the case does not address the rule of lenity.  The rule of lenity "dictates that ambiguous statutory language in criminal statutes should be strictly construed to ensure that we do not penalize conduct that Congress did not intend to criminalize."  United States v. Cuellar, 478 F.3d 232, 300 (5th Cir. 2007).  "The rule of lenity is triggered if the interpretive issue is subject to some doubt, and the doubt must be resolved in favor of the defendant."  Id.

Congress did not specifically authorize regulations giving rise to criminal liability under §

355(i), and the motion to dismiss counts 41-55 of the superseding indictment is granted.

**C.  Motions to dismiss for failure to state an offense**

Dr. Palazzo contends that the superseding indictment fails to allege an offense under the

health care fraud statute.  "The Federal Rules of Criminal Procedure require that the indictment

be 'a plain, concise and definite written statement of the essential facts constituting the offense

charged.'"  <u>United States v. Ratcliff</u>, 488 F.3d 639, 643 (5th Cir. 2007); Fed. R. Civ. Pro. 7(c)(1).

"The indictment is sufficient if it alleges every element of the crime charged and in such a way

as to enable the accused to prepare his defense and to allow the accused to invoke the double

jeopardy clause in any subsequent proceeding."  <u>Id</u>. (internal quotation and citation omitted).

The law does not compel a ritual of words, and the indictment's validity depends on practical,

not technical considerations.  <u>Id</u>.

The health care fraud statute, 18 U.S.C. § 1347, under which Dr. Palazzo is charged

provides:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme
> or artifice--
>    (1) to defraud any health care benefit program; or
>    (2) to obtain, by means of false or fraudulent pretenses, representations, or
> promises, any of the money or property owned by, or under the custody or control
> of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or
> services, shall be fined under this title or imprisoned not more than 10 years, or
> both.  If the violation results in serious bodily injury . . . such person shall be
> fined under this title or imprisoned not more than 20 years, or both; and if the
> violation results in death, such person shall be fined under this title, or imprisoned
> for any term of years or for life, or both.

### 1.  Motion to dismiss counts 1-14 and 15-27 of the superseding indictment[8] (count 1)

Dr. Palazzo contends that the superseding indictment fails to allege in counts 1-14 fraud in Medicare billing for the PHP program because the necessary Evaluation and Management (E&M) Key Components were not alleged.  Dr. Palazzo further contends that counts 15-27 fail to allege that she submitted false bills to Medicare and Medicaid as the provider of services that a physician's assistant actually performed because there are no allegations that the E&M Key Components were not accomplished.  Alternatively, Dr. Palazzo requests a bill of particulars specifying the "face to face" treatments that Dr. Palazzo allegedly billed for in counts 1-14 and the specific activities of the physician assistants that form the basis of counts 15-27.

The American Medical Association (AMA) assigns five-digit numerical codes to medical procedures performed by health care providers (Current Procedural Terminology or CPT codes).  Medicare, Medicaid, and insurance companies establish a fee for each service rendered, as described by its CPT code.  CPT code books contain several codes for professional services classified as E&M services.  E&M CPT codes are divided into broad categories such as office visits, hospital visits, and consultations, and two or more sub-categories of E&M services.  The subcategories are divided into levels that describe the nature of physician's work by type and place of service and the patient status, including the complexity of the service and the time typically required to provide the service.  Fees paid are commensurate with the amount of work required.

---

[8]   Counts 1-14 allege fraudulent billing for CPT codes 99232 and 99233.  Counts 15-27 allege that Dr. Palazzo submitted false bills to Medicare and Medicaid for services performed by a physician's assistant.

Codes 99231, 99232, and 99233 are hospital care codes for reviews of medical records and results of diagnostic studies and changes in admitted patients.  These are services that require the physician to meet face-to-face with a patient.  A physician typically requires 15, 25, and 35 minutes at the bedside and on the patient's hospital floor or unit to perform the necessary medical services, such as obtaining a comprehensive history or conducting a physical exam of the patient.                                             Code 99361 is a team medical conference with an interdisciplinary team of health professionals to coordinate activities of patient care.  The expected time is 30 minutes, but Medicare provides no reimbursement for this service.

A physician's assistant is a practitioner permitted by the State to provide medical services under the supervision of a physician.  Medicare reimburses physician's assistant services at 85% of the scheduled fee for the same service if provided by a physician.  Payment is made to the employer, not directly to the physician's assistant.

The superseding indictment in counts 1 to 27 alleges a scheme to defraud health care benefit programs by billing for services that were not provided by Dr. Palazzo, creating false documentation to collect payment for benefits and services not provided, and using physician assistants to see the patients and create false documentation to support false bills to Medicare and Medicaid.  Each of the codes upon which the billing is based require that Dr. Palazzo spend some time with the patient and have components describing the complexity of the visits under each code.  Accordingly, the superseding indictment states the essential facts constituting the offense charged.  The motion to dismiss counts 1-27 of the superseding indictment is denied.

17

Dr. Palazzo requests a bill of particulars to inform her of the specific charges against her. The purpose of a bill of particulars is to inform the accused of the charge with sufficient precision to reduce trial surprise, to enable adequate defense preparation, and critically, by the fleshing out of the charges to illuminate the dimensions of jeopardy." United States v. Davis, 582 F.2d 947, 951 (5th Cir.1978).  However, the discovery device should not used to compel detailed disclosure of the government's evidence before trial.  United States v. Sheriff, 546 F.2d 604, 606 (5th Cir.1977).

The request for a bill of particulars is denied.  Counts 1-14 of the superseding indictment identify the billing alleged to be fraudulent by patient, date, claim number, and CPT code, based on Dr. Palazzo's failure to see those patients face-to-face.  Counts 15-27 identify the date, patient, and claim number.  Counts 28-40 identify the dates of submission of false invoices to Touro to support claims for reimbursement from Medicare.

## 2.  Motion to dismiss counts 28-40 of the superseding indictment

Dr. Palazzo contends that counts 28-40 fail to state an offense for defrauding a health care benefit program.  She argues that the superseding indictment alleges that she obtained money from Touro Infirmary by falsely submitting invoices, but charges Dr. Palazzo with defrauding Medicare by obtaining money owned by and under the custody and control of Medicare.  Dr. Palazzo argues that there are no allegations in counts 28-40 that she made any representations to Medicare, received any money from Medicare, or had any contact with Medicare.  Dr. Palazzo contends that she submitted her invoices to Touro, Touro paid her for her services as a Medical Director, and Medicare partially reimbursed Touro for the money it paid

18

Dr. Palazzo.

The court finds that the charges in counts 28-40 of the superseding indictment adequately state an accusation of an offense that Dr. Palazzo executed a scheme to defraud Medicare.  The superseding indictment alleges that a "health care benefit program" was the victim of the fraud, which was accomplished by making false representations to Touro on specific invoices in order to obtain money under the custody and control of Medicare.  The charges reflect the terms of each "Professional Services Agreement" with Touro, *e.g.* gov't's exh. 2, which contemplate that payment for services will be made by Medicare or another health care benefit program.  The agreement requires that Dr. Palazzo "assist the Hospital in designing and implementing appropriate programs for the chronically mentally ill for which there are payors, with particular emphasis on Medicare."  <u>Id</u>.  The agreement was subject to amendment in "the event Medicare, Medicaid, any third party payor, or any other Federal, State, or local laws, rules, regulations or interpretations" substantially changed the method or amount of reimbursement or payment for services under the agreement.  <u>Id</u>.  Dr. Palazzo was required to make her records available to the Secretary of Health and Human Services and the Comptroller General of the Government Accounting Office and to comply with "all applicable provisions of federal, state, local and other laws, ordinances, and government rules and regulations, including without limitation the Medicare and Medicaid Anti-Fraud and Abuse or Anti-Kickback Amendments to the Social Security Act. . . ."  <u>Id</u>.

Accordingly, the superseding indictment is sufficient to allege the crime charged and to permit the defendant to prepare a defense.  The motion to dismiss counts 28-40 of the

superseding indictment is denied.

**D.  Motion to strike surplusage**

Dr. Palazzo contends that the following paragraphs should be stricken from the

superseding indictment as surplusage:[9]

> 28.  It was further part of the scheme and artifice to defraud that Palazzo
> exercised control over the lives of certain psychiatric patients by having them in
> group homes over which she had ownership, control or influence.  The defendant
> also maintained frequent orders for home health services even though she was
> allegedly seeing the patients on a daily basis.  When the defendant became
> affiliated with Touro, she eventually moved her patients to "Touro at Home,"
> Touro's home health agency, which was required to hire two nurses who had been
> with the defendant's patients for years.

"The fifth amendment guarantees a criminal defendant the right to be tried only on

charges presented in an indictment returned by a grand jury."  United States v. Ramirez, 670

F.2d 27, 28 (5th Cir. 1982).  Rule 7(d) authorizes the court to "strike surplusage from the

indictment or information" upon the defendant's motion.  Fed. R. Crim. Pro. 7(d).  "For language

to be struck from an indictment, it must be irrelevant, inflammatory, and prejudicial."  United

States v. Graves, 5 F.3d 1546, 1550 (5th Cir. 1993).  Because the standard is exacting, a court

rarely grants such a motion.  See Wright, Federal Practice and Procedure:  Criminal 3d § 127 at

639 (citing United States v. Hedgepeth, 434 F.3d 609, 611 (3rd Cir. 2006)("Motions to strike

surplusage are rarely granted.")).

---

[9]     The motion to strike surplusage was based on the original indictment and filed prior
to the return of the superseding indictment.  The court addresses the language as it appears in the
superseding indictment because the defendant's argument concerns striking all references to the
subject matter of the group homes as a means for Dr. Palazzo to exercise control over the
patients, rather than the specific language of either the indictment or the superseding indictment.

The government intends to prove the elements of the offense of health care fraud by evidence that there was a scheme to defraud a health benefit program.  The specific allegation that one of the ways Dr. Palazzo accomplished that scheme was to control her patients' attendance at the PHP through living arrangements in a group home setting.  The language Dr. Palazzo seeks to strike concerns the manner in which Dr. Palazzo maintained control over the patients.  The language is relevant to the charge and describes in part how Dr. Palazzo was able to accomplish the alleged scheme to defraud.  Accordingly, the motion to strike surplusage is denied.

New Orleans, Louisiana, this   24th  day of October, 2007.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**