## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**          **CIVIL ACTION**

**VERSUS**                            **NO: 05-0266**

**MARIA CARMEN PALAZZO, M.D.**        **SECTION: "S"**
**PH.D., MMM**

### ORDER AND REASONS

**IT IS HEREBY ORDERED** that Maria Carmen Palazzo, M.D. Ph.D., M.M.M.'s

"Motion for Judgment of Acquittal and, in the Alternative, for New Trial, is **DENIED**.

(Document #193.)

### I. BACKGROUND

On March 31, 2008, Dr. Maria Carmen Palazzo proceeded to trial on a superseding

indictment which charged 39 counts of health care fraud.  On April 16, 2008, the jury returned a

verdict of guilty on all counts.  A forfeiture proceeding was held following the verdict, and the

jury found the amount of forfeiture to be $655,260.97.  Palazzo filed a motion for judgment of

acquittal, pursuant to Rule 29 of the Federal Rules of Civil Procedure and, alternatively, a

motion for a new trial, pursuant to Rule 33.  The gravamen of Palazzo's argument is that the

government focused its efforts at trial on proving a scheme to defraud and the submission of

bills, but did not prove the executions of the health-care fraud scheme in each of the counts of the superseding indictment.

## II. DISCUSSION

**A.  Legal standard**

"Rule 29 . . . tests only the sufficiency of the evidence introduced at trial to support the crime charged."  United States v. Hope, 487 F.3d 224, 225 (5th Cir. 2007).  Rule 29(a) provides in relevant part: "[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  The court assesses "whether a reasonable jury could have properly concluded, weighing the evidence in a light most deferential to the verdict rendered by the jury, that all of the elements of the crime charged had been proven beyond a reasonable doubt."  United States v. Hope, 487 F.3d at 227-28.  "[I]f the fact finder was presented with sufficient evidence to support the verdict reached, that verdict must be upheld."  United States v. Lucio, 428 F.3d 519, 522 (5th Cir. 2005).  "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence."  United States v. Mitchell, 484 F.3d 762, 768 (5th Cir. 2007) (internal quotation and citation omitted).  The "standard of review does not change if the evidence that sustains the conviction is circumstantial rather than direct."  Id.  "But the evidence presented must allow the jury to find every element of the offense beyond a reasonable doubt."  United States v. Uvalle-Patricio, 478 F.3d 699, 701 (5th Cir. 2007) (internal quotation and citation omitted).

The court may not grant a Rule 33 motion for a new trial "unless the evidence

preponderates heavily against the verdict such that it would be a miscarriage of justice to let the verdict stand."  United States v. Fuchs, 467 F.3d 889, 910 (5th Cir. 2006).

**B. Elements of health-care fraud**

Section 1347 provides in relevant part:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice--
> (1) to defraud any health care benefit program; or
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by or under the custody or control of any health care program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

"[T]he health care fraud statute, § 1347, punishes executions or attempted executions of schemes to defraud, and not simply acts in furtherance of the scheme."  United States v. Hickman, 331 F.3d 439, 446 (5th Cir. 2003).  "[A]lthough the crime of health care fraud is complete upon the execution of a scheme, any scheme can be executed a number of times, and each execution may be charged as a separate count."  Id.  "[E]ach part of the scheme that creates a separate financial risk is a separate execution."  Id. (citing United States v. DeLaMata, 266 F.3d 1275, 1288 (11th Cir. 2001).  "[T]ransactions that have a common purpose but involve separate and independent obligations to be truthful may also constitute separate executions."  Id.  The factors to be considered in a decision of whether a particular transaction is an execution of the scheme or a component of the scheme are: "the ultimate goal of the scheme, the nature of the scheme, the benefits intended, the interdependence of the acts, and the number of parties involved."  Id.[1]

---

[1]     In Hickman, the nature of the scheme "was to submit false claims to health insurers. The benefit was the money rendered by the insurer to TMM/Hickman after each false claim was

**C.  Health-care fraud in counts 1-27 (PHP)**

In the superseding indictment, the grand jury charged that, beginning in August 2000 and continuing until March 2005, Palazzo executed a scheme to defraud health care benefit programs–Medicare and Medicaid–and to obtain money owned and under the custody and control of Medicare and Medicaid, in violation of 18 U.S.C. § 1347.  The nature of the scheme was to submit false claims to Medicare and Medicaid, the benefit was the money paid to Palazzo, and each claim was a separate execution of the scheme.  Counts 1-14 charge executions of the scheme to defraud by falsely billing and causing to be billed to Medicare under CPT[2] codes 99232 and 99233[3] for individual face-to face visits she did not perform.  Counts 15-27 (except 16, which was dismissed prior to trial) charge executions of the scheme to defraud by submitting false bills to Medicare and Medicaid listing Dr. Palazzo as the provider of the service when she knew that a physician's assistant performed the service.[4]

---

processed, accepted, and paid.  Financial gain was also the ultimate goal."  Id. at 447.  The Court of Appeals held that the interdependence of the acts was dispositve.  "Hickman submitted each claim separately.  Although she may have grouped them for efficiency, each claim was individually considered and approved.  And, with each claim submission, Hickman owed a new, independent obligation to be truthful to the insurer."  Id.  In Hickman, three counts of conviction were analyzed for plain error because of an *Ex Post Facto* error.  Id.

[2]  The American Medical Association assigned five-digit numerical codes to medical procedures known as Current Procedural Terminology (CPT) codes.

[3]  Evaluation and Management (E&M) mid-level hospital follow-up CPT code 99232 and high-level hospital follow-up CPT code 99233 are defined as subsequent hospital care, per day, for the evaluation and management of a patient, which requires at least two of three key components: a detailed history, an expanded examination, and complex medical decisionmaking.

[4]  The government maintains that no services performed by Palazzo's physician's assistant were reimbursable by Medicare or Medicaid.

Palazzo challenges the sufficiency of the evidence to support health care fraud in counts 1-27. She acknowledges that CMS[5] 1500s were submitted to and paid by Medicare or Medicaid for each of the patients in counts 1-27. She argues that the government's evidence is insufficient to prove health care fraud because the government focused its efforts on proving the schemes, but failed to prove executions of the scheme for each count, or to prove criminal intent.

**1. Proof of the scheme to defraud**

Palazzo argues that the evidence was insufficient to support the convictions. She argues that summary charts which the court allowed the government to display to the jury was unduly prejudicial, inaccurate and misleading, and did not conform to the evidence. Palazzo argues that evidence relating to operation of a group home were misleading and prejudicial and, thus, inadmissible.

**a. Summary charts (Government's exhibit 42)**

Palazzo contends that the government's theory of the case was that she billed for more hours each day than she possibly could have worked, and the government supported the theory with summary charts, which were not competent evidence. Palazzo contends that the charts were inaccurate, misleading, and prejudicial and that they were not based on the evidence.

The court permitted the use of summary charts as a pedagogical device, not as evidence. "[T]he use of charts as 'pedagogical' devices intended to present the government's version of the case is within the bounds of the trial court's discretion to control the presentation of evidence

---

[5]    Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), which is a branch of the Department of Health and Human Services.

under [Federal Rules of Evidence] 611(a)."  <u>United States v. Taylor</u>, 210 F.3d 311, 315 (5th Cir.

2000).  "Such demonstrative aids typically are permissible to assist the jury in evaluating the

evidence, provided the jury is forewarned that the charts are not independent evidence."  <u>Id</u>.

The charts were designed to show the number of hours per day Palazzo claimed to have

worked.  In assigning the time to the Medicare and Medicaid billing, the government used the

guidelines suggested by the CPT guidelines.  Palazzo argues that it was improper to impute a

time factor to Medicare and Medicaid visits, and that Medicaid and Medicare visits are but one

visit and should not have been counted twice.  Palazzo also objects to the listing on the chart

time that she spent managing real estate holdings in 2000 because the evidence presented

through her accountant related to her activities in 2001 and 2002.

The government introduced documentary and testimonial evidence in support of the

charts, and Palazzo had the opportunity to challenge the evidence and cross-examine witnesses,

raising the arguments she puts forth in this motion.  Further, the jury was instructed as follows

that summary charts are not evidence: "Certain charts and summaries have been shown to you

solely to help explain the facts disclosed by the books, records, and other documents which are

in evidence in the case.  These charts and summaries are not evidence or proof of any facts. You

should determine the facts from the evidence."  The jury was made aware of the fact that the

times for Medicare and Medicaid billing illustrated on the chart was calculated according to

guidelines and did not represent actual time spent as alleged by Palazzo.  Palazzo has not

demonstrated that the charts were misleading or prejudicial, that they did not accurately reflect

the documentary evidence or that they rendered the evidence of the scheme to defraud

insufficient.

**b.  Group home as part of scheme**

The government presented evidence of a group home on Sixth Street, which housed

many of the patients in the Partial Hospitalization Program (PHP),[6] which was run by Palazzo for

on the 8th floor of the Gumbel Building at Touro.  Although Palazzo owned the home, she leased

it to a group home operator.  The evidence included photographs of filthy apartments, strewn

with litter, spoiled food, and sparse furnishings.  Witnesses described conditions that were not

conducive to human habitation.  Anthony Sparacio, the Deputy Fire Marshal for the State of

Louisiana, testified that he inspected the Sixth Street home on July 23, 2001, along with

representatives of the State Attorney General's Office, the Department of Social Services and the

Health Department.  When the group arrived, they observed residents "milling around the

courtyard area" behind a locked gate.  Marcia Bates, an investigator with the Medicaid Fraud

Control Unit of the Attorney General's Office, testified that a woman drove up and unlocked the

chains on the gate, the only means of access or egress from the premises.  Bates inspected each

apartment and found that they were sparsely furnished, most had no sheets, and they were not

air-conditioned.  One apartment had a stove, a refrigerator and a table with an open container of

butter, peanut butter, and pickles.  The stove did not function, and the refrigerator was "filthy."

No one was on the premises attending to the patients, and Bates could communicate with only

---

[6]     PHPs  provide intensive psychiatric care and closely resemble that of a highly
structured, short term, inpatient hospital program.  Continued treatment requires evidence that
less intensive treatment options could not provide the level of support necessary to maintain the
patient and to avoid hospitalization.

two of them.  Unoccupied units were filled with old furniture, refrigerators, and stoves.  Many areas smelled of urine.

Palazzo contends that the government's emphasis on the deplorable conditions at the Sixth Street group home was misleading and irrelevant because the group home had nothing to do with Medicare or Medicaid billing.

The government was required to prove that there was a scheme to defraud.  The government's theory was that one of the ways Palazzo accomplished the scheme of routinely billing Medicare and Medicaid was to control her patients' attendance at the PHP by having them live in group homes.  The evidence was relevant to prove the existence of a scheme.  Although the photographs and other evidence depicting the living conditions of the group home were prejudicial, the probative value is not substantially outweighed by unfair prejudice.  See Fed. Rule Evid. 402 and 403.  Accordingly, Palazzo's challenge to the evidence of the group home does not establish that the evidence was irrelevant or misleading.

### 2.  Executions of the schemes with knowledge and intent

Palazzo argues that the government failed to offer evidence of "execution" of each specific count.  She contends that no witness testified about the treatment of these patients on each particular day.  Palazzo argues that much of the evidence at trial did not relate to the counts in the superseding indictment and that the government caused the jury to assume that violations occurred with the filing of each CMS 1500 form without specific evidence for each one.

Palazzo contends that the government proved that a bill was submitted, but presented no evidence concerning the invalidity of the bills.  As to counts 1-14, Palazzo argues that there is

ample authority that treatment team meetings were billable to Medicare, even though she did not have a face-to-face visit with the patients.

Palazzo argues that the government presented evidence that she did not spend sufficient time with each patient to justify a billing. She argues that she used "component" billing, not "time" billing, and the evidence established that a physician is entitled to bill by components as long as two of the three components in CPT codes 99232 and 99233 are present. The charges in count 1-27 of the superseding indictment allege that Palazzo billed for work which she did not perform herself. The evidence of time and component billing is relevant to show that, under either measure, Palazzo could not have provided treatment represented by the CPT codes.

Moreover, Palazzo contends that the government failed to prove criminal intent. Palazzo argues that the government had to prove that she knew that each of the 26 specific bills alleged in counts 1-27 (except count 16) were fraudulent because the treatment was not provided by her. Palazzo argues that the evidence at trial demonstrated that the Medicare rules and regulations are not clear or unambiguous, nor are they well known to Palazzo; therefore, there is no clearly established rule that she violated.

As an example of the lack of proof of criminal intent, Palazzo contends that there are conflicting pronouncements by Medicare on the use of a physician's assistant's "incident to"[7]

---

[7]    An "incident to" service occurs when a non-physician practitioner performs a service for the billing provider.  See Timberlake trial testimony.  The physician may bill Medicare for 100% of the physician's fee for services performed in an office setting by a physician's assistant under "incident to" if the physician is immediately available for direct supervision.  Id.  If the physician's assistant performs the service under general supervision, *e.g.* supervision by telephone, or independently, Medicare pays 85% of the fee charged by a physician.  Id.  "Incident to" billing is also appropriate in a hospital setting.  The direct supervision provision is

services in hospital and PHP settings, particularly in Louisiana.  She argues that she did not have

to be present when her physician's assistant performed "incident to" services in a hospital

because other physicians are readily available.  Further, Palazzo argues that the government did

not prove that only hospitals could bill for physician's assistant services because, unlike social

workers and occupational therapists, the services are "unbundled"[8] and can be billed by the

physician assistant's employer.

**a.  Counts 1-14**: Submitting bills for services that were not performed

Paragraph 37 of the superseding indictment lists 14 transactions executed or attempted to

be executed as part of the scheme to defraud.  Each execution gives the date, the patient's

initials, a claim number, and the E/M CPT code, either 99233 or 99232, under which services

were billed.  Each CMS 1500 form for those counts, signed by Palazzo, was introduced into

evidence.

In order to bill under an E/M CPT code, there must be a face-to-face visit and two of the

three components must be performed.  See Tr. testimony of Dr. Richard Baer.  Renee

Timberlake identified the three components as follows: the first component is a past, present, and

social history of the patient; the second level is comprised of 12 different areas of the physical

---

met in a hospital setting because there are other doctors present.  See Dr. Baer trial testimony.

[8]     Prior to January 1, 1998, no separate payment could be made for professional
services of a physician's assistant furnished to hospital in-patients because these services were
"bundled" into payments made directly to the hospitals for hospital services and billed under the
hospital's cost report.  Restrictions were removed after January 1, 1998, and the physician
employer could bill Medicare directly for the professional services of a physician's assistant,
even for in-patients.  See Tr. exh. Def. 18, Medicare Hospital Manual.

examination, scored according to the number of areas the provider addresses; and the third level

is medical decision-making, based on the condition of the patient and the results of tests or

diagnostic studies.  The E/M codes are not coded for time, but a time factor is assessed as a

guideline.  For example, CPT code 99231 has a guideline time factor of 15 minutes; CPT code

99232, 25 minutes; and CPT code 99233, 35 minutes.  Id.  The government presented consistent

testimonial evidence from numerous witnesses employed in the PHP or in Palazzo's private

practice that Palazzo did not perform face-to-face services under CPT Codes 99232 and 99233

for any of the claims in counts 1-14.[9]  The following is a sample of the testimony:

Kelly Lindner and Gail Boylan testified that the patients spent about five hours a day at

the PHP.  They arrived between 8:30 and 8:45 a.m. for breakfast.  Except for a half-hour lunch

break and two 15-minute smoking breaks, the patients attended 50-minute group therapy

sessions until they were returned to their homes at 2:00 p.m.

Several witnesses testified that Palazzo did not arrive at the PHP on the 8th floor of the

Gumbel Building or her private office on the 7th floor until the afternoon.  Vince Alford,

Palazzo's house manager, testified the she did not leave the house until 1:30 or 2:00 p.m.  Kelly

Porter, office manager, testified that Palazzo spent her mornings at home or attending to personal

matters.  Testimony of employees in Palazzo's office and in the PHP corroborated that Palazzo

---

[9]   Palazzo contends that the government did not prove criminal intent because Medicare
rules were not clear, unambiguous, and well-known to her.  Specifically, she argues that the
government attempted to impose a time factor on billing for E/M codes, rather than her
consistent component billing.  The argument concerning any ambiguity in the rules regarding
time versus component billing is not relevant to Palazzo's criminal intent because the
government's theory is that Palazzo billed for face-to-face visits with these patients that did not
take place.

was not present during the morning hours.  Madonna Bertrand, who worked for Palazzo as a

"medical biller," testified that Palazzo arrived at her 7th floor office between 1:00 and 2:00 p.m.

Rob Leonard, one of Palazzo's employees, testified that Palazzo typically got to the office

between 1:30 and 2:00 p.m.

Gail Boyland testified that Palazzo was not in the PHP in the morning, but arrived in the

afternoon.  Boyland, Kelly Lindner, and McNair testified that Palazzo was in the PHP two or

three times a week and typically stayed between 10 and 20 minutes.  When Palazzo arrived at the

PHP, the patients were either in group session or on break.  Lindner and Mary Clare Outlaw

testified that Palazzo often went to the PHP at the end of the patients' day when they were

leaving.  Several employees testified that Palazzo would literally "see" the patients and greet

them.  If a patient had a question, Palazzo would answer in a group setting.

McNair testified that Palazzo did not have an examination room in the PHP where she

could conduct an evaluation and management.  Boylan testify that she never witnessed Palazzo

conducting an individual session with any patient in PHP.  McNair testified that Palazzo's

interaction with individual patients was brief and lasted between 30 and 60 seconds.  Boylan

testified that Palazzo told the staff members to go down to her office if they needed anything; but

McNair stated that Palazzo was not there when they needed her, and it was difficult to get in

touch with her.

The government presented the following evidence that Palazzo billed for services she did

not perform.  Bertrand testified that Palazzo taught her to bill Medicare by using the current PHP

census, rather than the daily services being performed.  McNair and Lindner testified that the

12

PHP census was sent to Palazzo's private-practice office on the 7th floor by FAX each morning after the patients arrived.  Brewer testified that the bills to Medicare for the E/M visits for the PHP patients were prepared by 8:30 each morning, before any service was rendered.  Rob Leonard corroborated that the bills were prepared before the patients received any services. Brewer stated that the billing did not reflect whether Palazzo saw the patient on any given day. Cindy Durand, Palazzo's office manager, testified that Palazzo left instructions that Medicare be billed every day for the entire list of PHP patients unless Palazzo told her otherwise.  Deborah Lehrman, who replaced Durand as office manager/director, testified that she knew nothing about billing, but was instructed to enter CPT code 99231 and, "every now and then," CPT code 99233, with no reason why a particular code was to be entered.  Palazzo always signed the CMS 1500 without complaint.  Kelly Porter, who also worked as an office manager, testified that Palazzo instructed her that Medicare had to be billed as soon as her office received the daily census of PHP patients.

Bertrand stated that there was a template in the computer used for billing services for approximately 30 patients in the PHP census for each day Monday through Friday.  Four days a week, CPT code 99231 was billed; but one day a week, either Monday or Tuesday, the higher level CPT code 99233 was billed.

Eric Gardner, Palazzo's former patient on the psychiatric unit of Touro, testified that, after he was discharged, Palazzo initially hired him to work for her property maintenance company.  Within a few weeks, Palazzo asked Gardner to enter PHP patient information, some a year old, in the computer because Palazzo was behind in the paperwork because of a shortage of

staff.  Gardner worked several nights, sometimes through the night, going through the nurse's

log for the PHP patients.  He testified that Palazzo taught him to "cut and paste" from similar

notes to create PHP patients' notes.

Sometimes after the patients left the building, Palazzo would announce a meeting with

her treatment team in her private-practice office on the 7th floor.  A treatment team was

composed of the PHP staff who cared for the patients, *i.e.* the nurse, social workers, and

recreation therapists.  The team members spoke about each patient and his/her progress for

approximately three to five minutes in Palazzo's presence.  Palazzo entered information into the

computer as PHP staff spoke, and her notes were placed in the Touro PHP patient chart.  Several

PHP employees testified that patients never attended "treatment team."  Dr. Baer testified that

treatment team can be a component of an E/M service; however, it is not a substitute for the face-

to-face component between the doctor and the patient, which must occur on the same day.

In addition to the testimonial evidence, the government presented exhibits indicating that

the time billed to Medicare, Medicaid, Touro and other entities, as well as her real estate

business and personal commitments, totaled in excess of 24 hours a day.  The government argues

that Palazzo's excessive billing, coupled with other activities, is circumstantial evidence that she

did not treat each of the patients identified in counts 1-14.

Weighing the evidence in the light most favorable to the verdict, the evidence is

sufficient to support the element of "execution" for the charges in counts 1-14 beyond a

reasonable doubt.  A reasonable jury could have properly concluded from the evidence of

Palazzo's activity on a given date that Palazzo did not perform the service billed for, as charged

in the indictment.  The evidence supports the jury's conclusion that Palazzo executed the scheme to defraud health care benefits programs by knowingly causing to be filed each of the CMS 1500s in a routine and haphazard manner, knowing that she had not performed the face-to-face services represented by each bill.  Accordingly, the motion for judgment of acquittal of the convictions in counts 1-14 is denied.

### b.  Counts 15-27: Claiming services of a physician's assistant as services having been provided by her

Paragraph 40 of the superseding indictment charges that Palazzo submitted false bills as the provider of service, which Natalie Prejean, the physician's assistant performed, and identifies each execution in counts 15-27 by date, patient initials, and claim number.  The government introduced into evidence each CMS 1500 form for billing services identified in counts 15-27. The forms were signed by Palazzo and indicated that she performed services under CPT Code 99231 for each PHP patient.[10]

The government provided testimonial and documentary evidence that the services billed on the dates and for the patients alleged in the superseding indictment were provided by Natalie Prejean.  Specifically, Prejean testified that she saw an average of 30 patients every day at the PHP in about an hour, which she opined was an inadequate amount of time.[11]  She stated that Palazzo was not with her when she worked with patients, and that was the point of hiring her.

_____

[10]    Natalie Prejean had a provider identification number (PIN).  If Prejean provided a service, she should have been identified in Box 33 of the CMS 1500 as the physician's assistant. Prejean testified that she did not know that she had a PIN number, and she never signed a CMS 1500.

[11]    Prejean also worked with hospital patients and private office patients.

Prejean testified that Palazzo arrived at the PHP routinely at 2:00 p.m., at about the same time the PHP patients were leaving.  Prejean prepared patient notes on a computer program, and Palazzo adopted and signed the notes as her own.  Prejean was not asked to sign a hard copy of her notes, but she assumed that the staff knew they were her notes.  When Prejean learned that Dr. Palazzo was claiming the notes as her own, she started typing her name at the bottom of each note.

When Leonard began working as Palazzo's office manager, she asked him to prepare an assessment of her office practice.  Leonard wrote and submitted policies and procedures to Palazzo, but he did not know if they were implemented.  Although Leonard is not an expert on billing practices, he had concerns about the codes that were charged for Prejean's PHP visits.  He recommended that Palazzo have legal counsel review the billing practices to be sure they were appropriate.

At the time Leonard prepared his report, he was under the impression that Palazzo and Prejean were conducting rounds on the PHP together.  Leonard testified that he later learned that Palazzo was rarely on the PHP floor with Prejean and usually arrived after lunch.

Leonard testified that the patient roster was brought down to the 7th floor by 9:00 a.m., and Madonna Bertrand would enter the charges for the day from the list, charging under 99231 unless she was told otherwise.  Prejean had not written any PHP notes for the day's services by 9:00 a.m.  Leonard spoke with Palazzo about this business practice, and she answered that she knew what she was doing.

Weighing the evidence in the light most favorable to the verdict, the evidence is

sufficient to support the conviction beyond a reasonable doubt for the charges in counts 15-27.

A reasonable jury could have properly concluded from the evidence that, as charged in those

counts, Palazzo was never with Prejean when she saw patients and that Palazzo improperly

billed for PreJean's services as though Palazzo were the provider.  Accordingly, the motion for

judgment of acquittal of the convictions in counts 15-27 is denied.

### D.  Health care fraud in counts 28-40: Submitting false invoices for medical director services

On July 5, 2000 and July 27, 2001, Dr. Palazzo entered into a professional services

agreement with Touro, under which Dr. Palazzo was to provide consultation services for the

Adult Psychiatric Programs at Touro.  On June 1, 2002 and June 1, 2003, Dr. Palazzo and Touro

entered an agreement for Dr. Palazzo to provide medical director services for the Inpatient Adult

Psychiatric and Adult PHPs at Touro.  Each agreement was for a one-year term and provided

compensation at a rate of $150 per hour up to 80 hours a month.  Dr. Palazzo was required to

provide a written monthly statement documenting the amount of time spent and detailing

services  rendered.

Each of the medical director invoices included several hours of PHP staffing meetings,

which were not attributable to her medical director duties.  The government presented

testimonial evidence that the only meetings that Palazzo held were treatment team meetings to

discuss patients' progress.  According to the medical-director agreement, Palazzo's

administrative duties and delivery of patient care were mutually exclusive activities.  Gov. exh.

1215.

17

In addition, Rob Leonard testified that the January 2001 medical-director invoice included a "networking" meeting with him when he was employed at Specialty Hospital, but he had no recollection of a meeting with Palazzo on that date on any matter related to Touro that he would have discussed (count 28).  Kelly Brewer testified that Palazzo included on the March 2001 invoice (count 30) meetings with nursing facilities and services that were performed by Brewer and documented as having been conducted by Palazzo.  The December 2001 invoice (count 34) includes six hours of activity on a day when Palazzo was sitting for two exams to complete her masters degree in Medical Management.  Mark Steinbauer testified that he recalled no meetings with Palazzo that appear on the May 2002 invoice (count 35).

Leonard testified further that he expressed his concern to Palazzo regarding the medical director invoices, specifically that the dates and time were correct.   He testified that Palazzo became annoyed at his concern and said, "I know what I'm f. . . .ing doing.  And, besides, who looks at that stuff anyway?"

Weighing the evidence in the light most deferential to the jury's verdict, a reasonable jury could have properly concluded that the scheme to defraud involved, *inter alia*, the creation and submission of false monthly invoices for administrative services and other services, which Palazzo did not perform and that Palazzo knew that Touro would submit the invoices to Medicare and that Medicare would reimburse Touro for the costs.  Accordingly, the evidence is sufficient to support the crimes charged in counts 28 through 40, which each represent a single completed execution of a scheme to defraud, namely the submission of a monthly invoice containing false and inflated charges.

18

**E.  Forfeiture of proceeds of the fraud for the period of the indictment**

The jury found that the amount of forfeiture, representing the proceeds of the Medicare and Medicaid fraud over the period of the indictment, is $655,260.97.  Palazzo contends the calculations are erroneous.  Palazzo argues that the amount of forfeiture is limited to the proceeds traceable to the commission of the offenses for which she was convicted.

The criminal forfeiture statute applicable to health care offenses provides:

> The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

18 U.S.C. § 982(a)(7).

Palazzo first argues that, assuming that she was entitled to submit a bill for reimbursement of 85% of her rate for services provided by Prejean, the forfeiture should be limited to 15% because the government does not allege in counts 15-27 of the indictment that no billable services were provided.  Palazzo further argues that Medicaid payments of $95,000 are not traceable to the offense of conviction because counts 1-14 do not charge fraud against Medicaid, and that sum was derived from other components of her practice.

The theory of the government's case in counts 1-27 was that Palazzo charged Medicare and Medicaid for services which she did not perform.  Under the forfeiture statute, the "gross proceeds" traceable to the offenses of conviction are forfeitable.  There is no authority for Palazzo's argument that she is entitled to a set-off for services that were actually performed.  See United States v. Boesen, 473 F.Supp.2d 932, 953 (S.D. Iowa 2007).  "The offense was the

19

submission of fraudulent claims under a specific code that called for a payment in a specific amount." Id. As to the forfeiture of Medicaid proceeds, the government presented testimonial evidence of Joseph Kopsa that the Medicaid payments for the period in the indictment were crossover payments for the "co-pay" only for those Medicare patients who were also covered by Medicaid.

Palazzo further argues that the evidence is insufficient to prove that Medicare's reimbursement of $92,000 to Touro is traceable to the offense of conviction in counts 28-40. Palazzo contends that there is no evidence that all of the medical-director charges were fraudulent, and to the extent that any entries were fraudulent, the fraudulent entries did not result in payment of $92,000.

As discussed above, the evidence at trial supports a conviction for the creation and submission of false monthly invoices to Touro for administrative services and other services, which were not properly chargeable as medical-director services. Under the criminal forfeiture statute, the gross proceeds traceable to the invoices are forfeitable.

Accordingly, the evidence is sufficient to establish the forfeitability of the property in the amount of $655,260.97.

### III. CONCLUSION

The motion for judgment of acquittal is denied because evidence presented was sufficient for the jury to find beyond a reasonable doubt every element of the crimes charged in counts 1-40 of the superseding indictment. Further, the evidence is sufficient to prove that the amount of forfeiture represents the gross proceeds traceable to the commission of the offense. Moreover,

the evidence does not preponderate heavily against the verdict; therefore, a motion for a new trial is denied.

New Orleans, Louisiana, this <u>18th</u> day of December, 2008.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**